UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF LOUISIANA

IN RE:

ROSS SHAUN ADAIR                                                         CASE NO. 22-10249
     DEBTOR                                                           CHAPTER 13

STUTSMAN CONSTRUCTION, LLC
     PLAINTIFF

VERSUS                                                                 ADVERSARY NO. 22-1009

ROSS SHAUN ADAIR
     DEFENDANT

**MEMORANDUM OPINION**

Stutsman Construction, LLC ("Stutsman") filed this adversary proceeding seeking to have its state court judgment against Ross Shaun Adair ("Shaun") excepted from discharge on account of alleged willful and malicious injury suffered by it under 11 U.S.C. § 523(a)(6).[1] Trial came before the court on June 15, 2023. At the conclusion of trial, the court took the matter under advisement and now renders its ruling.

**Jurisdiction, Venue and Core Status**

This court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157. Venue is proper pursuant to 28 U.S.C. § 1409(a). The matter constitutes a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(I).

---

[1] The original complaint advanced multiple theories set forth specifically in 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6). Stutsman later dismissed its causes of action under §§ 523(a)(2)(A) and (a)(4), leaving §523(a)(6) as its remaining cause of action.

**Findings of Fact**

Many of the facts are not in dispute. Shaun's home flooded in 2016. Thereafter, he entered into a contract with Stutsman on September 7, 2016, for repairs approved by his mortgage company, Freedom Mortgage.[2] Later, Shaun decided he wanted work completed in addition to the repairs approved by Freedom Mortgage, and he and Stutsman entered a second contract that included the additional work.[3] Shaun's girlfriend, Megan Meyers ("Megan"), whom he lives with along with their children, was the "day-to-day" contact for Stutsman regarding the repairs.

To pay for the repairs, Shaun's mortgage holder, Freedom Mortgage, issued four checks for the construction work. Each check listed both Shaun and Stutsman as payees. In each instance the checks were sent to Shaun. Of note, these checks were not made payable to Debtor *and* Stutsman, rather both names were listed without containing an "and" or "or" in between.

It is undisputed that Shaun endorsed the first three checks received and gave them to Stutsman.[4] In each instance, an inspector came to the home first to make sure work had been done in keeping with the request for partial payment. In May 2017, a representative of Freedom Mortgage inspected the work done by Stutsman, and then on June 22, 2017, Freedom Mortgage issued a final check in the amount of $71,755.48 to the payees, again with no qualifying "and" or

---

[2] The total amount of the initial contract was $158,761.90 plus a $10,500 supplemental contract for a total contract price of $169,261.90; Shaun signed both the initial contract and supplement. Exhibit P1, pp. 5-13.

[3] The total amount of the second contract was $174,629.31. Exhibit P8.

[4] The first check was issued by Freedom Mortgage on November 8, 2016, in the amount of $10,000.00. Exhibit P3. The second check was issued by Freedom Mortgage on November 18, 2016, in the amount of $74,630.95. Exhibit P4. The third check was issued by Freedom Mortgage on March 24, 2017, in the amount of $18,242.88. Exhibit P5.

"or" between the payees' names.[5] This time, however, rather than endorsing it and giving it to Stutsman as he had with the first three payments, Shaun, without advising Stutsman or seeking its permission, endorsed the check and deposited it into his bank account. It is also undisputed that Shaun never gave any portion of the proceeds to Stutsman.

Shaun claims he called his bank and asked if it was "illegal" for him to deposit the check in his own account. Presumably emboldened by the phone call, Shaun deposited the $71,755.48 into his account.

As one might expect, Stutsman's manager, Roy Atkins a.k.a. Roy Stutsman ("Roy") contacted Shaun for payment. Shaun refused, contending he was unhappy with the work done and that the work was incomplete.[6] Shaun alleged problems such as caulking, gaps in molding and floorboards, a chipped shower pan, water damage in the master bathroom, construction debris left on site, and painted plywood being used in the garage instead of sheetrock.[7]

Roy claims the only work remaining to be completed under the contract with Shaun consisted of small "punch list" items and that the sole complaint made by Shaun prior to denying final payment was water damage in the master bedroom caused by a pipe leak.[8] On behalf of Stutsman, Roy offered to fix the problem, but Shaun instead wanted Stutsman to pay for an independent plumber to make the repairs at Stutsman's own expense.

---

[5] Final check issued by Freedom Mortgage on June 22, 2017, in the amount of $71,755.48, Exhibit P6.

[6] Shaun introduced excerpts of text message conversations into evidence. Exhibit D9. Because Shaun introduced only messages in his favor rather than the complete text threads, they are of little probative value.

[7] The parties disagree as to whether installing sheetrock in the garage was part of their agreement.

[8] As part of the contract, Stutsman installed a new HVAC system at Shaun's house. After the installation, a pre-existing, rusted pipe leaked causing the damage.

Roy then met Shaun at his house to discuss his concerns. In an attempt to appease Shaun and collect the final payment, Roy presented Shaun with a "Proposal & Authorization" that included three options.[9] The first option included Stutsman doing "punch list" items to finish the job and relocating the air conditioner drain to fix the leak. The second option included Stutsman doing some "punch list" items, relocating the air conditioner drain, replacing the garage ceiling with sheetrock, and providing Shaun a shower door. The third option allowed Shaun to hire a new contractor to make repairs. That option provided that Stutsman would clean up construction debris, leave sheetrock for Shaun's use, and reimburse Shaun $1,000 from the final payment in order for Shaun to pay the new contractor. Shaun refused all options and refused to give Stutsman the final $71,755.48 payment from the mortgage company.

## Procedural Background

Stutsman filed suit against Shaun,[10] and on July 31, 2020, the 23rd Judicial District Court for Ascension Parish issued a money judgment in favor of Stutsman and against Shaun in the amount of $71,755.48, plus judicial interest from the date of judicial demand (August 17, 2017), reasonable attorney fees of 25%, costs of $5,859.74 through July 30, 2020, and all additional costs including collection ("Judgment").[11]

---

[9] Proposal & Authorization, Exhibit D8, p. 4.

[10] Petition for Breach of Contract and Damages on Open Account, 23rd Judicial District Court for Ascension Parish Case no. 119.691, Exhibit P1, pp. 1-3.

[11] Judgment, P2.

Shaun filed a voluntary petition under chapter 13 of the Bankruptcy Code on May 24, 2022.[12] On September 15, 2022, Stutsman filed this complaint seeking to except from discharge its Judgment. Stutsman later dismissed its causes of action under §§ 523(a)(2)(A) and (a)(4), leaving §523(a)(6) as its remaining cause of action.[13]

The parties filed cross motions for summary judgment. Stutsman's motion sought partial summary judgment solely as to the validity and amount of the debt memorialized in the state court Judgment.[14] Shaun sought summary judgment dismissing the complaint.[15] On March 2, 2023, the court granted Stutsman's motion[16] and denied Shaun's motion.[17]

## Law

Section 523(a)(6) of the Bankruptcy Code excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." In *Matter of Miller*,[18] the Fifth Circuit held that "an injury is 'willful and malicious' where there is either an objective substantial certainty of harm or a subjective motive to cause harm." Although the provision is typically thought to involve tortious personal injury kinds of claims, the Fifth Circuit has also held that "section 523(a)(6) excepts contractual debts from discharge when those

---

[12] Case no. 22-10249.

[13] P-30.

[14] P-14.

[15] P-18.

[16] P-30.

[17] P-33. The court ruled, among other things, that several of Shaun's defenses to liability should have been raised as defenses in the state court proceeding.

[18] *Matter of Miller*, 156 F.3d 598, 606 (5th Cir. 1998).

debts result from an intentional or substantially certain injury…." *Williams v. International Brotherhood of Electrical Workers Local 520 (In re Williams).*[19] The plaintiff bears the burden of proof by a preponderance of the evidence.[20]

More recently, in *Bordelon v. Boring (In re Boring),*[21] this court discussed how section 523(a)(6) relates to contracts:

> [T]he Fifth Circuit has held that a breach of contract *may* involve an intentional or substantially certain injury. *See In re Williams,* 337 F.3d 504, 510 (5th Cir. 2003); [*State of Tex. v.*] *Walker,* 142 F.3d [813,] 823 [5th Cir. 1998]; and *Miller,* 156 F.3d at 606. "[A] knowing breach of a clear contractual obligation that is certain to cause injury may prevent discharge under Section 523(a)(6)...." *Williams,* 337 F.3d at 510. But the intentional contract breach alone will not render a debt nondischargeable. "[T]he dischargeability of contractual debts under Section 523(a)(6) depends upon the *knowledge and intent* of the debtor at the time of the breach." *Id.* (Emphasis added.) And the plaintiff must prove that the defendant intended an "objective substantial certainty of harm or a subjective motive to cause harm." *Miller,* 156 F.3d at 606.

### Testimony at Trial and Legal Analysis

This case largely turns on the relative credibility of the witnesses. The two principal witnesses, Shaun and Roy, present quite a different picture as to what happened.

The court finds Roy's testimony credible, both as to the work completed by his company and its significant financial injury suffered by the failure to get paid in full for his work. Roy testified that Shaun's sole complaint prior to denying final payment was water damage in the

---

[19] *Williams v. International Brotherhood of Electrical Workers Local 520 (In re Williams)*, 337 F.3d 504, 510 (5th Cir. 2003).

[20] *Grogan v. Garner*, 498 U.S. 270, 291, 111 S.Ct. 654, 661 (1991).

[21] *Bordelon v. Boring (In re Boring)*, 445 B.R. 576, 580 (Bankr. M.D. La. 2011).

master bedroom caused by a pipe leak.[22] And as Stutsman's sole owner, a self-described "mom and pop" business, Roy convinced the court that Shaun's decision to keep the last check caused great financial harm to his business. He testified that not receiving the final installment left Stutsman with approximately $50,000 in unpaid related debts of its own and no profit at all for the work performed. From the tenor of the testimony, the court is persuaded that Stutsman came very close to going out of business altogether because of this project.

The court also notes Roy's willingness to address Shaun's concerns, which was corroborated by the three options he presented to him in writing.[23] Roy indisputably had authority to offer a resolution to Shaun.

The court takes further note of the fact that the mortgage company signed off on the work following inspection and cut a final check accordingly. That action by a non-party contradicts Shaun's self-serving testimony about the extent of the unfinished work or the poor craftsmanship by Stutsman.

Although Shaun did not bear the burden of proof at trial, his testimony and the evidence adduced (or noticeably absent) were highly probative as to whether he intended injury to Stutsman. Indeed, his intent to do harm (or not) is at the very core of this case. With the harm caused element easily satisfied, Stutsman still had to prove Shaun's intent to do that harm.

Shaun testified that the inspector sent by his mortgage company did not thoroughly inspect the property but simply asked if he was waiting for the final payment. According to

---

[22] As part of the contract, Stutsman installed a new HVAC system at Debtor's house. After the installation, a pre-existing, rusted pipe leaked causing the damage.

[23] Proposal & Authorization, Exhibit D8, p. 4.

Shaun, she told him she would "say it was 100% done," so he could receive the last payment. The court does not find Shaun's testimony on this exchange credible. It strains all reason to believe that the inspector sent by Freedom Mortgage signed off on Shaun receiving a check for $71,755.48 without the work being complete or satisfactory. The mortgage company's interest, after all, is in its collateral being restored, which is the reason it sends inspectors before issuing final payments.

Shaun also testified that he called Freedom Mortgage and was told not to pay Stutsman. Aside from being hearsay, this testimony borders on nonsensical and is therefore given no weight. The court seriously doubts that Freedom Mortgage would direct Shaun not to pay Stutsman after its own inspector represented to it that the work was complete and satisfactory.

To justify his actions in keeping the final check, Shaun testified that he called his bank, read the check to a bank representative, and asked if it would be "illegal" for him to deposit the check with only one signature. No one from the bank testified, so the court is left to glean intent from Shaun's hearsay testimony concerning what the bank representative told him, *i.e.,* that he could negotiate the check without a signature from Stutsman.

This line of testimony is highly relevant but not for the reasons Shaun hoped. Shaun maintains this encouragement or advice from the bank shows he lacked intent to injure Stutsman. On the contrary, it supports a finding, at least in the court's view, that Shaun knew that what he was doing was questionable, perhaps even illegal, and that he intended to keep the check from Stutsman and use it for himself. The fact that the bank was legally willing to negotiate the check with only one signature has no bearing on this case. Shaun cannot excuse or justify his conduct by relying on what the bank representative may have told him.

Finally, Shaun testified that he had every intention of paying Stutsman eventually and only kept the check as leverage to address outstanding issues with the project. Again, there was no corroborating evidence presented that indicates the truth of this statement. The court does not believe Shaun had any intention to pay Stutsman. If depositing the check was truly a leverage play, it would rationally follow that some counter to Roy's three options would have been made at the face-to-face meeting. That did not happen.

Megan's testimony did little to help Shaun's case. Her primary contribution was explaining at trial what the pictures of the home represented and their claim that the work by Stutsman was subpar. Although the pictures reflected some obvious areas for further attention, the court believed Roy concerning the "punch list" nature of the remaining work.

Megan, like Shaun, was unable to convince the court that they spent the withheld funds repairing their house. It bears mentioning that although Shaun complained about several of the appliances installed by Stutsman, he admitted that none of the appliances have actually been replaced. And although Shaun did not have the burden to prove what he did with the money, the court cannot help but wonder where the "after" photographs were showing the improved state of the home after they spent the $71,755.48. Indeed, the only verified payments made by Shaun to other companies totaled less than $4,000, a sum hardly worth the time and effort to take additional pictures.[24]

---

[24] A plumbing estimate from C & B Plumbing Repairs, Inc. for $3,650 dated July 12, 2017, shows $1,425 and $2,175 as paid. Exhibit D3. An invoice from Rooster Lips Company, Inc., a company that deals with septic systems, dated October 2, 2017, for $290 shows it as paid. Exhibit D6. Shaun also introduced an invoice from Gator Environmental Waste Solutions, LLC dated July 12, 2019, for $20.00. Exhibit D4.

This court addressed a similar, yet distinguishable, issue in *McBrier v. McDaniel (In re McDaniel)*.[25] In that case, the debtor hired a contractor to make repairs to his home after a tree fell on it. The debtor's insurer issued a check jointly payable to the debtor and her mortgage company, but not the contractor. After a property inspection, the mortgage company endorsed the check, and the debtor cashed it.

When the debtor refused to pay, the contractor filed suit in state court and was awarded a money judgment. The debtor filed a bankruptcy petition, and the contractor filed a complaint to have its judgment excepted from discharge pursuant to section 523(a)(6). The court ruled in favor of the debtor because it found no conversion of funds, relying on the fact that the contractor had no property interest in the funds. In other words, the contractor was not a payee on the check.

Here, Stutsman *was* a payee on the check at issue. This gave it a property interest missing in the *McBrier* case.

Another helpful case is *Karr Plex, Ltd. v. Hollier (In re Hollier)*.[26] There, the debtor ("Hollier") orally agreed to sell cars owned by a third party ("Shereck") on consignment. Shereck delivered roughly 10 cars to Hollier. For the first four cars, Hollier sold the cars and then paid Shereck the agreed upon portion. However, for the last six cars, Hollier sold them but only paid Shereck about one-third of the amount due. He also stopped payment on one check.

---

[25] *McBrier v. McDaniel (In re McDaniel)*, 368 B.R. 515 (Bankr. M.D. La. 2007).

[26] *Karr Plex, Ltd. v. Hollier (In re Hollier)*, 517 B.R. 671, 679 (Bankr. W.D. La. 2014).

The court, citing the Fifth Circuit decision in *Williams*,[27] determined that it "must look to Hollier's knowledge and intent at the time he breached his agreement with Shereck and determine whether Hollier committed a knowing breach of a clear contractual obligation that was certain to cause injury."[28] The court found that Hollier's failure to pay the established percentage owed was "substantially certain to cause harm to Shereck."[29]

The U.S. Supreme Court long ago weighed in on how a course of conduct between parties might impact a finding of willful and malicious behavior. In *Davis v. Aetna Acceptance Co.*,[30] the Supreme Court opined, "There may be an honest but mistaken belief, engendered by a course of dealing, that powers have been enlarged or incapacities removed. In these and like cases, what is done is a tort, but not a willful and malicious one."[31]

Here, the first three checks had been issued to two payees, following inspection, and delivered to Shaun. Shaun endorsed each check before turning them over to Stutsman, thereby establishing a course of conduct between the parties. With the final check, Shaun intentionally chose not to pay Stutsman and instead kept the insurance proceeds. Shaun's deliberate deviation from the parties' course of conduct weighs toward his actions being willful and malicious.

---

[27] *Williams*, 337 F.3d at 510.

[28] *Hollier*, 517 B.R. at 679.

[29] *Hollier*, 517 B.R. at 680.

[30] *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151 (1934).

[31] *Davis*, 293 U.S. at 332.

Finally, in *Berry v. Vollbracht (In re Vollbracht)*,[32] the Fifth Circuit made clear that a plaintiff in a "willful and malicious" case will lose if the debtor's conduct is deemed sufficiently justified.[33] This court gives no pass to Shaun for first calling his bank to be sure it was not "illegal" for him to deposit the check without Stutsman's endorsement. That act in no way excuses his behavior or shows that he lacked intent to harm Stutsman but rather shows a calculated attempt not to pay Stutsman for his work. A more plausible explanation for the phone call is Shaun wanted to make sure he was not committing a crime by trying to negotiate the check alone.

Shaun also attempted to justify his behavior by showing that he needed the $71,755.48 to fix and complete Stutsman's shoddy work. He contended, without satisfactory corroborating evidence, that he used most or the majority (he said both at different times) of the final $71,755.48 payment from the mortgage company to fix problems caused by Stutsman and to complete work Stutsman should have done under the contract. He attempted to prove this by introducing the following into evidence:

1. A plumbing estimate from C & B Plumbing Repairs, Inc. for $3,650 dated July 12, 2017, that shows $1,425 and $2,175 as paid,[34]
2. An invoice from Gator Environmental Waste Solutions, LLC dated July 12, 2019, for $20.00,[35]

---

[32] *Berry v. Vollbracht (In re Vollbracht)*, 276 F. App'x 360, 361 (5th Cir. 2007).

[33] *Id.* at 362.

[34] C & B Plumbing Repairs, Inc. estimate, Exhibit D3.

[35] Gator Environmental Waste Solutions, LLC invoice, Exhibit D4.

3. An estimate from Mr. Green Jeans Insulation, LLC dated November 16, 2017, for $1,600,[36]

4. An invoice from Rooster Lips Company Inc., a company who deals with septic systems, dated October 2, 2017, for $290 marked "Pd,"[37] and

5. An undated "bid memo" from Stafford's Remodeling & Repair ("Stafford") for $22,900.[38]

The court seriously discounts both Shaun's and Megan's testimony on what was done with the money, as both witnesses were noticeably uncomfortable and vague when asked point blank by the court what they did with the $71,755.48. The written evidence admitted only proved they spent less than $4,000 for certain plumbing and septic tank services. Shaun submitted no proof that the estimates from Stafford and Mr. Green Jeans Insulation, LLC resulted in actual contracts, much less payment for goods and services provided. Shaun testified that Stafford did work on the house, but the scope of work did not include everything in the estimate. When asked for written proof of payment made to Stafford, Shaun responded with a rather incredible contention that he paid $22,000 in cash.

Even if the court accepted Shaun's testimony that he spent the entire $28,460 itemized in the estimates and invoices on repairs, he made no effort to explain what happened to the remaining $43,295.48 of the funds. And curiously, while Megan testified at length about Stutsman's work while pointing to pictures taken at the time of final inspection, she was

---

[36] Mr. Green Jeans Insulation, LLC estimate, Exhibit D5.

[37] Rooster Lips Company Inc. invoice, Exhibit D6.

[38] Stafford's Remodeling & Repair bid, Exhibit D7.

presented with no pictures taken after the alleged curative repairs were made.[39]  The court is left with no choice but to draw a negative inference as to the existence of such pictures.

To be clear, the court is not ruling that Shaun's failure to substantiate his subsequent use of the funds he kept was, in and of itself, willful and malicious conduct.  But the disingenuous testimony on the subject and the lack of corroborating evidence does figure into the court's ruling.

## Conclusion

Based principally upon the testimony at trial, and applying the legal standards outlined above, the court finds that Stutsman carried its burden of proving Shaun knowingly breached his clear contractual obligation to pay Stutsman when he kept the final check,[40] and his decision not to pay Stutsman was objectively and substantially certain to cause harm to Stutsman's business.  Shaun knew he was supposed to turn over the funds to Stutsman and made a conscious decision not to.  Roy's testimony that Stutsman had paid for materials and labor and hired subcontractors, with roughly $50,000 owed to them in the aggregate, certainly confirms harm was done.  Objectively, any reasonable person dealing with Stutsman, a small operation under any conceivable standard, would know that keeping the final check would cause great financial harm.

---

[39] Pictures, Exhibit D2.

[40] Though Shaun is not sophisticated or well-educated, there was no evidence or indication that he lacked the ability to tell right from wrong or lacked the knowledge of what his contract with Stutsman entailed.  Also, although sophistication of the witness is a factor, it is not over-riding.  This is not a case of a "dumb but honest" debtor. *See Gen. Elec. Capital Corp. v. Acosta* (*In re Acosta*), 406 F.3d 367, 372 (5th Cir. 2005), *overruled on other grounds as recognized by Husky Int'l Elecs., Inc. v. Ritz* (*In re Ritz*), 832 F.3d 560, 565 n.3 (5th Cir. 2016).

Accordingly, the debt evidenced by the Judgment is deemed nondischargeable under section 523(a)(6) of the Bankruptcy Code on account of Stutsman's willful and malicious injury suffered at the hands of Shaun.[41]  The court will enter a separate judgment.

Baton Rouge, Louisiana, July 14, 2023.

**s/ Michael A. Crawford**
MICHAEL A. CRAWFORD
UNITED STATES BANKRUPTCY JUDGE

---

[41] The ruling in this case should not be taken as an indication that every breach of contract for lack of payment is "willful and malicious" under section 523(a)(6). It depends on the facts and circumstances of each case.